UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

RICKEY LEE BOOKER,

     **Plaintiff,**

v.                                    2:13cv516

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

     **Defendant.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Rickey Lee Booker ("Booker") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for a period of disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act. Specifically, Booker claims the ALJ failed to analyze whether his mental limitations constituted a listed impairment and improperly weighed the medical opinion of consultative examiner, Dr. Goodman. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this Report concludes that the ALJ's analysis of listed impairments omits the listing most relevant to Booker's alleged impairments. As a result, the undersigned recommends the Court

remand to permit analysis of Listing 12-05.

## I.    PROCEDURAL BACKGROUND

Booker filed applications for SSI and DIB, alleging disability beginning July 15, 2008 due to physical and mental impairments that included seizure activity, hypertension, and leg and heart problems. (R. 166). The Commissioner denied his application initially (R. 124-33), and upon reconsideration. (R. 136-38, 143-45). Booker then requested an administrative hearing, which was conducted in Norfolk on May 3, 2012. (R. 42-62).

An Administrative Law Judge ("ALJ") concluded that Booker was not disabled within the meaning of the Social Security Act, and denied his claim for benefits. (R. 25-35). The Appeals Council denied review of the ALJ's decision (R. 1-3), thereby making the ALJ's decision the final decision of the Commissioner. Booker then filed this action seeking judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g). This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II.    FACTUAL BACKGROUND

Booker has previous experience as a landscaper. (R. 45, 49-51, 57). He was 53 at the time of the administrative hearing and last worked in 2009. (R. 29, 42, 85). He involuntarily left that employment following an alleged seizure that occurred on the

job. (R. 49). On his application, and at the hearing, Booker stated he was unable to work due to recurring seizures that have exacerbated his other conditions over time - specifically his high blood pressure, leg weakness and heart problem. (R. 53-55, 103, 167).

Indeed, Booker's limited medical records document intermittent hospital visits between 2007 and 2012. They generally disclose follow-up care regarding Booker's hypertension and a somewhat inconsistent history of seizure activity, as well as Booker's heavy alcohol use and apparent abuse. Because neither counsel has directed the Court to anything in the prior treatment records that would bear specifically on the ALJ's analysis of listed impairments, a lengthy recitation of Booker's medical background is unnecessary. Booker's medical treatment primarily relates to sporadic complaints of seizures.

As an example, Booker was admitted to the hospital for a possible seizure episode on March 16, 2009. (R. 268). The attending provider noted Booker's history of seizures, hypertension, and alcohol and tobacco abuse, and observed that he had not taken any medication for the past 2 years. Booker also personally admitted to not having had a seizure since 2002. On exam, he had a normal stress test and neurological examination, and was prescribed Keppra for his seizures. After

3

being "strongly counseled" to quit abusing alcohol and tobacco, Booker was discharged in less than 30 minutes. (R. 268-70).

During two follow-up visits in April and July of 2009, Booker presented with controlled hypertension and no seizure activity. (R. 292-93). On both occasions, however, he was admonished to "stop drinking!" Id. Notwithstanding this, Booker presented in an intoxicated state for his July appointment, prompting the provider to assess ethanol abuse. (R. 292). Booker returned a year later, again out of medication, but ready to "take better care of himself." (R. 291). His hypertension had relapsed to an uncontrolled state, but he had had no seizures in the past year. Id. Indeed, Booker's seizure condition remained stable as late as December of 2011. (R. 342).

In addition to his treating providers, Booker's records were reviewed by two state agency physicians. Patricia Staehr, M.D. reviewed the evidence on July 30, 2010. (R. 88-89). She noted Booker had no exertional limitations, but did have some postural restrictions. Id. Specifically, she determined Booker could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but could never climb ladders, ropes or scaffolds. (R. 89). Additionally, Dr. Staehr noted Booker's seizures were currently controlled with medication and the record disclosed no evidence related to his alleged leg problems.

4

Martin Cader, M.D. then reviewed Booker's records on March 8, 2011. (R. 108-10). Like Dr. Staehr, Dr. Cader opined that Booker had no exertional limitations, but did suffer from some postural restrictions. Dr. Cader determined Booker could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but could never climb ladders, ropes, or scaffolds. Id. He also determined Booker should avoid concentrated exposure to identified hazards, such as machinery and heights. (R. 109-10).

At the hearing before the ALJ, Booker testified that he never completed the 8th grade and was unsure whether he participated in any special education program while in school. (R. 47). He indicated that his reading ability was poor, as was his ability to handle his finances or count money. (R. 47-48). Booker also testified he tries shopping for himself, but cannot read labels, and instead relies on product recognition to make his purchases. (R. 48). Booker claimed he was still having seizures, though they "come and go." When asked what happens when he has a seizure he replied, "I don't know. I'll black out and that's it. I wake up in the hospital." (R. 53).

Regarding his leg, Booker testified he had visited a doctor who told him he had a blockage which required him to sit and take breaks frequently only after walking a block. (R. 54). He claimed he could "hardly stand," and was unable to medically

5

address the issue due to a lack of insurance. (R. 56).

As a result of the intermittent and poorly developed medical history, the ALJ concluded on the record that he would order both a physical and mental consultative examination to supplement the record, but proceeded to examine the Vocational Expert regarding Booker's ability to perform work-related activities. (R. 58-59).

When prompted by the ALJ, the VE described Booker's previous landscaping work as medium, semi-skilled employment based on the supervising role he played. (R. 59). The ALJ asked the VE to consider a hypothetical individual of Booker's age and education, which the ALJ described as "probably seven or eight years of special ed, very limited ability to read and write." (R. 59-60). The VE was asked to assume that such an individual would be limited to simple, routine and repetitive tasks, further limited by a specific vocational preparation ("SVP") of no higher than 1 to 2, "with very minimal and basic reading or math skills needed for the job, only occasional interaction with the public and coworkers," a stable environment, and a restriction from heights and "hazards of any kind" due to possible seizure activity. (R. 60).

Recognizing those limitations would rule out Booker's past work, the ALJ asked the VE whether other employment opportunities exist in substantial numbers for an individual

6

limited to the outlined conditions. According to the VE, such an individual could work as an assembler of small products and a hand packer/worker at the light level, and a bench assembler and sorter at the sedentary level. Id. These responses were consistent with the DOT. (R. 61).

In response to the ALJ's request for further consultative examinations to be conducted in light of Booker's relatively limited medical records, Booker underwent two consultative examinations shortly after his hearing. First, on May 19, 2012, Matthew Sleziak, D.O., conducted the physical consultative examination. (R. 359-64). During his visit, Booker claimed he had received no treatment for an alleged heart condition, and reported having current symptoms of chronic pain, numbness, shortness of breath and weakness. He also reported a history of seizures, claiming he had had "intermittent seizures that are exacerbated by stress" and that he has not received any recent treatment for that condition. Moreover, Booker complained of chronic pain, stiffness and weakness in both legs. He reported the pain as 8/10 "on most days," but had not had any treatment for this problem. (R. 359).

On exam, Booker was alert with good eye contact and fluent speech. (R. 361). He had an appropriate mood and a "clear thought process." (R. 361-62). His memory and concentration were also normal, and he appeared well oriented to his surroundings.

(R. 362). Physically, Booker had an "unsteady and limping gait," but no palpable muscle spasms.[1] He was able to lift, carry and handle light objects, as well as dress and undress himself adequately. He was unable, however, to squat, tandem walk, walk on heels and toes and stand or hop on either foot. He also was "not cooperative" and "did not give good effort during the examination." (R. 362). His range of motion was difficult to assess due to his "exaggerated response of pain." (R. 363).

Dr. Sleziak's overall impression of Booker, however, was colored by Booker's apparent lack of effort during the examination itself. According to Dr. Sleziak:

> He was unable to complete the exam secondary to pain, which was a much exaggerated response especially on the right leg hip flexion. Leg extension, ankle and plantar flexion was less, but still had a much exaggerated response with screaming and yelling that I was doing something wrong when it was just gradual pressure. Even the claimant reported having a blockage in his right leg, but by just pressing the tibial tuberosity the claimant jumped off of the table. . . . The claimant was not able to bend his leg past 30 degrees without screaming in pain on examination. The claimant was observed walking out to his car, and when observed he did not seem to have any discomfort. The claimant quickly bent over and got into his car, bending well past the 30 degrees that he was complaining of with his leg. He also put his cane in the backseat of the car and did not walk with it when circling the car once and then getting into the passenger side. . . . The claimant's limitations were not able to be fully assessed due to this inconsistent examination and very poor effort that seemed very much a malingering situation.

---

[1] According to Dr. Sleziak's notes, Booker exhibited an exaggerated pain response during lower extremity and muscle strength testing. (R. 362).

(R. 363). Notwithstanding his "very poor effort" at completing the physical exam, Sleziak determined Booker would be able to sit, stand and walk normally in an 8 hour workday with normal breaks, and could lift and carry at least 25 pounds frequently and 50 pounds occasionally. Further, he documented no manipulative, communicative, or work place environmental limitations applicable to Booker. Lastly, Booker's limitations on bending, stooping, crouching and squatting could not be assessed given Booker's demeanor throughout the exam. (R. 364).

On June 4, 2012, Booker presented to Jeffrey S. Goodman, Ph.D. for his psychological consultative examination. (R. 377). Dr. Goodman noted Booker arrived on time, walked without the assistance of a cane, and displayed "no gross disturbance with [his] gait . . . ." Id. During Dr. Goodman's initial observation, Booker demonstrated a vague recollection of his previous employment, and could not remember how old he was when he dropped out of the 7th grade. (R. 378). Booker also indicated he could bathe and feed himself, though he refrained from cooking out of fear. Id. He claimed he frequently "forgets what he is doing," and has difficulty shopping alone and reading labels. When asked about his daily routine, Booker described "rising at 7:00 in the morning, dressing, sitting on the porch and waiting for friends to come by, playing cards, and that is it." Id.

On exam, Booker was cooperative throughout and expressed himself "with intelligibility" during the course of the interview. Id. Booker denied any depression, but indicated "fearfulness" at night due to a worry that he "will have a seizure and die." Id. Though he had thoughts of harming others and himself, he lacked any plan or intent and was judged low in lethality. He also denied any auditory or visual hallucinations and exhibited no evidence of paranoia. (R. 380). Dr. Goodman further observed that throughout the test administration, Booker displayed psychomotor retardation, "but more importantly, he does not have eyeglasses for visual correction and he definitely has problems with visual acuity." Dr. Goodman went on to note "[t]his problem impacted his test effort." Id.

During the course of this visit, Booker was administered the Wechsler Adult Intelligence Scale – Fourth Edition. Id. He obtained a Verbal Comprehension index of 56, placing him at the .2 percentile, a Perceptual Reasoning index of 65 at the 1st percentile, a Working Memory index of 58 at the .3 percentile, and a Processing Speed index of 50, below the .1 percentile. Id. Booker's Full Scale IQ score was 51, at the .1 percentile and "more than three standard deviations below the mean and falling well into the moderate range of mental retardation." Id. Dr. Goodman noted each of these index scores fall in the mild to moderate range of mental retardation, but also suspected that

10

Booker's Processing Speed score related to several factors, including the lack of eyeglasses to account for his poor vision. Id.

Regarding his substance abuse, Booker admitted to Dr. Goodman that he smoked a half-pack of cigarettes daily and continues consuming alcohol "once in a while." (R. 381). He later admitted he could sometimes drink a six pack a day and acknowledged being previously advised to stop by other providers. While Booker suggested he was not drinking as much as he used to, Dr. Goodman specifically noted medical records to the contrary that suggested a continuing habit. Id.

Ultimately, Dr. Goodman opined that Booker did not appear to evade any discussion, was simple in his thought process, expressed himself without much detail, but "[i]t was never felt that he intentionally offered contradictory information . . . ." Dr. Goodman tempered that statement, however, with an acknowledgment to Booker's attempts at minimizing his alcohol use.  Id. He diagnosed him with mild mental retardation, observing that Booker was cognitively limited, but also noting that that limitation "is further impacted" by his heavy alcohol use and vision problems. (R. 381-82). He determined Booker was not competent to handle funds and had difficulty with both simple and complex tasks. Accordingly, he "felt that [Booker] could [not] maintain regular work attendance on a consistent

basis because of his various health problems, but also complicated, perhaps, by his alcohol abuse." Moreover, Booker would "definitely require supervision on a job." (R. 382).

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. of New York v. NLRB</u>, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996); <u>Hays</u>, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that

decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.  ANALYSIS

To qualify for disability insurance benefits under sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as the:

> Inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A).  To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in

13

the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R. § 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to

14

the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

A.   The ALJ's Decision

In this case, after first finding that Booker met the insured status requirements of the Social Security Act through June 30, 2010, the ALJ made the following findings under the five part analysis: (1) Booker has not engaged in substantial gainful activity since his alleged onset date of July 15, 2008; (2) he had severe impairments of seizure disorder, ethanol addiction, and leg pain of unknown etiology; (3) he did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in Appendix 1; (4) Booker was unable to perform his past relevant work, but did have the RFC to perform light work limited to simple, routine,

15

repetitive tasks, with minimal and basic levels of reading, writing, and math requirements for the job, as well as limited interaction with the public and co-workers in a stable environment with no exposure to heights or hazards due to seizures; and (5) considering Booker's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that Booker can perform. (R. 27-34).

Booker's Motion for Summary Judgment challenges the ALJ's decision to discount the opinion of the consulting psychologist, Dr. Goodman. Specifically, Booker maintains the evidence, as presented to the ALJ in its entirety, necessitated a "serious analysis of [his] medical impairment under Listing 12.05" for mental retardation – an analysis that was never conducted. (ECF No. 8, at 13). As set forth in detail below, this Report agrees with Booker's argument.

B.  **The ALJ's determination that Booker did not meet or equal a listed impairment is not supported by substantial evidence.**

"The Social Security Administration has promulgated regulations containing 'listings of physical and mental impairments which, if met, are conclusive on the issue of disability." Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) (quoting McNunis v. Califano, 605 F.2d 743, 744 (4th Cir. 1979)). A claimant is entitled to this conclusive presumption of

impairment "if he can show that his condition 'meets or equals the listed impairments.'" Id. (quoting Bowen v. City of New York, 476 U.S. 467, 471 (1986)). To meet the requirements of a listing, a claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d).

The ALJ analyzed Booker's mental impairments under Listing 12.02 (Organic Mental Disorders), 12.04 (Depressive Disorders), 12.06 (Anxiety Disorders), and 12.08 (Personality Disorders). (R. 28). The opinion concluded that Booker's alcohol and poly-substance abuse did not meet the criteria under any of these listings. The ALJ also examined whether Booker's seizure disorder and leg pain met the requirements of other listings, and concluded they did not.

Despite the presence in the record of an IQ test by the consultative examiner, Dr. Goodman, which placed Booker in the "moderately mentally retarded range," the ALJ did not analyze the requirements of Listing 12.05 which applies to intellectual disabilities. Booker argues this was error. Specifically, he claims the ALJ's rejection of the evidence prepared by his consultative examiner is not supported by substantial evidence. He argues that the testimony and other evidence of Booker's significantly limited intellectual capacity warrants outright reversal for an award of benefits. Secondarily, he contends the

failure to analyze the most relevant listing, particularly in light of objective evidence that a dispositive criteria was met, mandates remand at a minimum.

The Commissioner disagrees. He notes that it is Booker's burden to prove that he meets the criteria of one of the listed impairments. The ALJ's opinion rejected Dr. Goodman's assessment, as well as the accompanying IQ test, affording them no evidentiary weight. As a result, the Commissioner claims that the ALJ's finding at Step 3, that Booker did not suffer from a listed impairment, is supported by substantial evidence.

After reviewing the record and both parties' arguments, this Report finds that the analysis of listed impairments is insufficient for the Court to conclude that the Commissioner's finding is supported by substantial evidence, as a result of the failure to analyze the most relevant listing. Accordingly, the undersigned recommends that the Court grant in part Booker's Motion for Summary Judgment and remand the case for analysis of the testing data, narrative report, and other evidence of Booker's intellectual impairment under Listing 12.05.

To meet the requirements of Listing 12.05, Booker had to show "deficits in adaptive functioning initially manifested during the developmental period; i.e. the evidence demonstrates or supports onset of the impairment before age 22." Hancock v. Astrue, 667 F.3d 470, 473 (4th Cir. 2012). In addition, the

18

listing requires proof of one of four requirements specified in the listing as A through D related to his intellectual capacity. Most relevant here, Requirement B is met by "a valid verbal, performance or full scale IQ of 59 or less," and Requirement C is met by a full scale IQ of 60 through 70 accompanied by "a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Sbpt. P App'x 1, 12.05(B)-(C). In this case, however, despite the consultative examiner's report, which included a full scale IQ score of 51, the ALJ did not analyze evidence of intellectual disability under 12.05. The absence of this analysis in and of itself is an adequate basis for remand. Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013) (noting that absence of analysis "makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings.").

The Commissioner's primary argument opposing remand rests on the ALJ's decision to afford Dr. Goodman's consultative exam and report, including the accompanying IQ test results "no evidentiary weight." (R. 33). The ALJ's conclusion on this point appears in his analysis at Step 4, when he arrived at Booker's limited light RFC. In rejecting Dr. Goodman's Opinion, the ALJ wrote:

Dr. Goodman's opinion is afforded no evidentiary

weight. Dr. Goodman[2] acknowledged that the claimant's lack of corrective lenses affected test results and that the claimant was not forthcoming regarding his ethanol abuse; yet he gave considerable credence to exam results as well as found multiple areas of marked functioning without adequately resolving issues related to the claimant's credibility and the validity of testing. The doctor apparently relied heavily on the subjective reported symptoms and limitations provided by the claimant and seemed to accept uncritically as true most, if not all, of what the claimant reported. Yet, as explained in [sic] there exist good reasons for questioning the reliability of the claimant's subjective complaints.

(R. 33).

In fact, it appears the ALJ was rightly skeptical of Booker's performance during his examination by Dr. Goodman. His opinion notes Booker's minimal effort during his physical examination by Dr. Sleziak. He mentioned Dr. Sleziak's observation that Booker's presentation seemed to be "very much a malingering situation," and observed in analyzing Dr. Goodman's later report that Booker presented with a normal gait, and using no cane, despite his limping, cane-assisted appearance for his physical exam two weeks earlier.

While these inconsistencies may well affect the validity of Dr. Goodman's overall assessment, they do not fully account for the ALJ's decision to completely disregard the IQ tests and avoid analyzing Listing 12.05 at Step 3.

_____

[2] The ALJ's opinion incorrectly referred to Dr. Goodman as Dr. Goldman, but quoted excerpt has been corrected for clarity.

In this Circuit, an ALJ may reject the results of an IQ test even if it is the only such result in the record. Hancock v. Astrue, 667 F.3d 470, 474 (4th Cir. 2012). It bears mention, however, that Hancock involved a detailed analysis of the 12.05 listing. Among the circumstances warranting rejection, the Court has recognized inconsistency with other medical evidence, or prior academic achievement. Id. (citing Muse v. Sullivan, 925 F.2d 785, 789-90 (5th Cir. 1991)(per curiam) and Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986) (per curiam)). In this case, however, Booker had virtually no prior medical record assessing his intellectual capacity, and as a result, the Commissioner requested Dr. Goodman's assessment. In addition, his academic record is evidenced only by Booker's testimony, during which he described dropping out of school in the seventh grade – at the age of 17.  (R. 46). As a result, it appears neither of these grounds support the ALJ's decision to totally reject Booker's IQ result. In addition, neither of these grounds was cited by the ALJ as a basis for rejecting the test.

In the analysis that was provided at Step 4, the ALJ observed that the lack of corrective lenses had impacted Booker's test performance.  But this impact, according to Dr. Goodman, was limited to only one part of the test, and Booker's scores were uniformly low on all parts of the test. The ALJ also noted that Dr. Goodman seemed to accept uncritically Booker's

self-report of symptoms. But the narrative report classifies Booker as only mildly mentally retarded, even though the same test score placed him firmly in the range of moderately mentally retarded. Moreover, The RFC fashioned by the ALJ also limits Booker to simple repetitive tasks and jobs at SVP 1 or 2 involving only minimal and basic levels of reading, writing and math, only occasional interaction with the public and coworkers, and a stable environment with minimal changes in work process from day-to-day. Apart from Dr. Goodman's narrative report and test results, which the ALJ assigned "no evidentiary weight," the only other evidence to support these substantial restrictions was Booker's self-report of his limited intellectual capacity.

All of this analysis, Booker observes, occurred in connection with the findings related to Booker's RFC, a step not reached until after relevant listings have been considered and eliminated. Had the ALJ analyzed Dr. Goodman's test results and the other evidence of Booker's work-limiting impairments and concluded that he failed to meet all three elements of a 12.05 listing, he may well have reached the same conclusion. But, the Court is not permitted to affirm on a basis not articulated by the Commissioner. York v. Colvin, No. 1:10cv665, 2014 WL 408718 at *5 (M.D.N.C., Feb. 3, 2014) (citing SEC v. Chenery, 318 U.S. 80, 87 (1943).

The Commissioner nevertheless argues that remand is not required as a result of the ALJ's failure to analyze Listing 12.05, because the opinion is not required to address every listing. While obviously true[3], this does not excuse the failure to analyze Listing 12.05 in Booker's case.

As noted, the listings which were analyzed in detail all involved other mental limitations which were only minimally supported in Booker's limited medical record. In fact, four of the listings examined arose from Booker's alcohol abuse, which the ALJ expressly found not to be a contributing factor in the disability determination.   (R. 28, 35).   In addition, the consultative exam was specifically ordered to assess Booker's limited intellectual capacity because of the lack of evidence in this regard.   (R. 45).   Dr. Goodman wrote that Booker was referred "to ascertain his current intellectual functioning." (R. 377). After receiving the report of Dr. Goodman's analysis and the test results, Booker's counsel specifically wrote to the ALJ to point out that Booker's full scale IQ score of 51 would meet the criteria under Listing 12.05(B).   (R. 267).   In addition, there was other evidence of Booker's limited intellectual capacity.  Booker's only work history involved landscaping. He testified that he had never lived on his own,

---

[3] The Appendix contains 14 categories of adult impairments, each with multiple listings. 20 C.F.R. § 404 Subpt. P, App'x 1.

and only completed the seventh grade. His function reports, completed for the agency, were written for him by a friend. (R. 222, 230). The ALJ appears to have at least partially credited this evidence as reflected in the severe limits in Booker's RFC.

Finally, the elements of a listing under 12.05 may be met with evidence of mental incapacity other than full scale IQ tests below 60. The definition of the listing refers "to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during a developmental period; i.e. onset of the impairment before age 22." 20 C.F.R. Sbpt. P, App'x 1, 12.05. The requirements may be met in a number of ways, including evidence of a full scale IQ score of 59 or less, or a score of 60-70 accompanied by "physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. 12.05(B)-(C).

The undersigned expresses no view on whether the evidence of Booker's intellectual disability is sufficient to meet the requirements of Listing 12.05. As the Commissioner's brief in this case points out, there are issues of proof unresolved by the present record. For example, the listing requires evidence of disability before age 22. Dr. Goodman opined that Booker's intellectual limitations likely began in "childhood." But his function reports and supervisory role in a prior landscaping

position seem to contradict that conclusion.  In addition, Dr. Goodman did not opine specifically on the validity (or invalidity) of Booker's IQ score - a requirement of the listing which would be Booker's responsibility to establish. Nevertheless, it is not for this Court to resolve these inconsistencies in the first instance.

Unfortunately, the ALJ conducted no analysis of Listing 12.05. As a result, the Court is not able to determine whether the conclusion that Booker does not meet the elements of the listing is supported by substantial evidence. Even if the ALJ was correct in discounting Booker's IQ score, without any analysis of Dr. Goodman's opinions in combination with the other significant intellectual impairments Booker's record established, the undersigned cannot conclude that the decision is supported by substantial evidence.  Accordingly, remand is the appropriate remedy.

## V.   RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court GRANT IN PART Booker's Motion for Summary Judgment and REMAND the case for analysis of the testing data and other evidence of Booker's intellectual impairment under Listing 12.05.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are

notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.   A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

                                    /s/
                              Douglas E. Miller
                              United States Magistrate Judge

                              DOUGLAS E. MILLER
                              UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

September 5, 2014

26